Adam D. Brumm, Esq.  SB#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>          Plaintiff,<br><br>    vs.<br><br>AES SUNOPTICS, INC., an Alabama corporation; A1 DISTRIBUTING, INCORPORATED, a California corporation; and DOES 1-10, inclusive,<br><br>          Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN" or "Plaintiff") hereby brings this civil action pursuant to the Federal Water Pollution

Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

## I.    INTRODUCTION

1.       This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendants AES SUNOPTICS, INC. and A1 DISTRIBUTING,

INCORPORATED ("Defendants") for current and ongoing violations of the National Pollutant

Discharge Elimination System ("NPDES") permit requirements of the CWA.

**Notice Letter**

2.      On or about September 4, 2024, EDEN provided a Notice of Defendants' violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) Executive Director of the State Water Resources Control Board ("State Board") and (4) to Defendants, including a copy delivered to Defendants by certified mail, to Facility Manager, AES Sunoptics, 6250 27th Street, Sacramento, California ("the facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of Plaintiff's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty days have passed since Plaintiff's Notice was properly and lawfully served on Defendants, the State Board, and the Regional and National EPA Administrators.

5.      Plaintiff is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

6.      This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

## II.  PARTIES

**Plaintiff**

7.      Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS is an environmental membership group organized under the laws of the State of California.

**Defendants**

8.      Plaintiff is informed and believes, and on such information and belief alleges, that Defendant AES SUNOPTICS, INC., located at 6250 27th Street, in Sacramento, California, is a corporation formed and domiciled in Alabama, which is currently in good standing with the Alabama Secretary of State.

9.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant AES Sunoptics, Inc. is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

10.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant A1 DISTRIBUTING, INCORPORATED is a California corporation currently in good standing with the California Secretary of State.

11.    Plaintiff is informed and believes, and on such information and belief alleges, that Defendant A1 Distributing, Incorporated is the legal property owner of Defendant AES Sunoptics' facility.

12.    Plaintiff is informed and believes, and thereupon alleges, that Defendant A1 Distributing, Incorporated had actual knowledge of Defendant AES Sunoptics' violations of the General Permit and the CWA, coupled with sufficient control over Defendant AES Sunoptics due to the terms of the lease between Defendant AES Sunoptics and Defendant A1 Distributing, Incorporated, but nevertheless failed to require that Defendant AES Sunoptics comply with applicable environmental laws, including the General Permit and the CWA.

## III.  JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

14.    Venue is proper because Defendants reside in and the events or omissions giving rise to Plaintiff's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## IV.  **ARTICLE III STANDING**

15.     Plaintiff's organizational purpose is the protection, preservation and enhancement of the rivers, creeks, streams, lakes and oceans (and their tributaries) in California.

16.     Plaintiff's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit, in seeking redress against Industrial Dischargers who violate the CWA by failing to comply with all standard conditions of the Industrial General Permit.

17.     Plaintiff's associational members volunteer their resources to join EDEN's organizational purpose and mission.

18.     Plaintiff's associational members reside throughout Northern California.  Some of EDEN's members reside, work and/or recreate near the Sacramento River, a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant AES Sunoptics' storm water run-off), and use those waters and their watersheds for kayaking, canoeing, cycling, recreation, duck hunting, sportfishing, swimming, hiking, bird watching, photography and nature walks.  Their use and enjoyment of these natural resources has been and continues to be adversely impaired by Defendants' failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA.

19.     Plaintiff has Article III standing as an association to bring this suit against Defendants, as at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury fairly traceable to Defendants' violations of the CWA and Industrial General Permit, which likely can be redressed by a judicial decision granting Plaintiff the injunctive relief requested herein.

20.     The aesthetic and recreational interests of the individual associational members of Plaintiff with Article III standing have been adversely impacted by Defendants' failure to comply with the procedural and substantive requirements of the Industrial General Permit and the CWA, as delineated herein.

21.     Plaintiff's associational members who qualify for standing in this matter are all current members who have been members of EDEN since at least September 4, 2024, the date that Plaintiff provided to Defendants the Notice Letter attached hereto as **Exhibit A.**

22.     Defendants' ongoing violations of the General Permit and the CWA have and will continue to cause irreparable harm to Plaintiff and its current standing members.

23.     The relief requested herein will redress the ongoing injury in fact to Plaintiff and its members.

24.     Neither litigation of the claims asserted, nor the relief requested in this Complaint, will require the participation in this lawsuit of any individual members of EDEN.

### V.  STATUTORY BACKGROUND

25.     Congress declared that the Federal Clean Water Act was designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters through federal and state cooperation to develop and implement programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters. 33 U.S.C. §§ 1251(a), 1252(a)

26.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into Waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act.  33 U.S.C. § 1342

27.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to Dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water Dischargers. 33 U.S.C. § 1342(p)

28.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits in California.

Citizen Suit Provision of the CWA

29.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1)

30.     No action may be commenced prior to sixty days after the plaintiff has given notice of the alleged violation to: (i) the Administrator of the EPA; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A)

31.     By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

32.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a).   Section 1319(d) declares that any person who violates any permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, $56,460.00 per day per violation for violations occurring after November 2, 2015; and $57,617.00 per day per violation for violations occurring after November 2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI(Q(1)

33.     Violations of the provisions of the General Permit, including those detailed below, constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4

**A. <u>General Permit</u>**

34.    The Water Board elected to issue a statewide General Permit for industrial storm water discharges.   Thus, the Permit under which this case arises is a federally required permit based upon California state substantive law.  *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5[th] 749 (2016)

35.    The Water Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The Permit was reissued on April 17, 1997, and again on April 1, 2014 ("General Permit"), pursuant to Section 402(p) of the Clean Water Act. 33 U.S.C. § 1342(p)

36.    The current General Permit went into effect on July 1, 2015, after which it was amended again on November 6, 2018, with the revisions becoming effective on July 1, 2020. [See California's Industrial General Permit, Order WQ 2014-0057-DWQ, as amended by Order WQ 2015-0122-DWQ and Order WQ 2018-0028-DWQ, which is fully incorporated herein by reference.]

37.    A complete copy of the current General Permit Order is accessible at https://www.waterboards.ca.gov/water_issues/programs/storm_water/igp_20140057dwq.html

38.    The General Permit includes both absolute *discharge prohibitions* and substantive and procedural *standard condition* provisions.

39.    To discharge storm water lawfully in California, all industrial facilities discharging, or having the potential to discharge, storm water associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing Permit Registration Documents, including a Notice of Intent to Discharge Storm water ("NOI") and an initial Storm Water Pollution Prevention Plan ("SWPPP") and Site Map.

40.    The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

1.  **SMARTS Compliance Database**

41.     The Water Board has established an online database referred to as its Stormwater Multiple Application and Tracking System (SMARTS").  SMARTS is a platform where Dischargers enter and manage storm water data associated with General Permit compliance.

42.     SMARTS is readily accessible by the general public on the web; and the system is maintained primarily for the purpose of providing public access to allow citizens to monitor Dischargers' compliance with the General Permit and to pursue Dischargers who fail to comply, utilizing the citizen's suit provision of the CWA.

43.     SMARTS can be accessed at California Stormwater Multiple Applications and Report Tracking System.

44.     The General Permit requires Dischargers to certify (under penalty of law) and submit to SMARTS all Permit Registration Documents, including Notices of Intent to Discharge Storm Water, Storm Water Pollution Prevention Plans and Site Maps; monitoring and sampling data, Exceedance Response Reports and Annual Reports.  General Permit §§ I(A)(17), II(A)(1), II(B)(1), II(D), XI(B)(11)(a), XXI(K), XXI(L), Attachment D.

2.  **Discharge Prohibitions of the General Permit**

45.     The discharge related prohibitions of the General Permit include Effluent Limitation V(A) of the General Permit, which requires Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

46.     Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

47.     Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit

prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plans or the applicable Regional Water Board's Basin Plan.

### 3. **Standard Conditions of the General Permit**

48.    In addition to discharge prohibitions, the General Permit contains a variety of substantive and procedural standard conditions.

49.    The General Permit requires that Dischargers comply with all standard conditions of the Permit and indicates that failure to comply with any standard condition of the General Permit constitutes an actionable, per se violation of the CWA, which comports with the provisions of 33 U.S.C. §1365(f)(7).  General Permit § XXI(A)

50.    The primary standard conditions of the General Permit include the following:

(a)    Continuously maintaining an accurate, up-to-date and compliant *SWPPP and Site Map*; implementing all provisions of the SWPPP, and certifying and submitting the SWPPP to SMARTS;

(b)    Implementing and maintaining *Best Management Practices*;

(c)    Conducting monthly and sampling event *visual observations*, contemporaneously completing observation reports and maintaining the reports for five years;

(d)    Collecting and analyzing *storm water runoff samples* four times per year;

(e)    Collecting the *storm water samples during qualified storm events, from all discharge locations, in all drainage areas* in places which are representative of industrial operations;

(f)    Testing the collected storm water samples for *all required parameters,* using the correct EPA test methods, and the prescribed sample holding times; and reporting the results to the Water Board within 30 days by certifying and submitting them to SMARTS;

(g)    Conducting *Annual Facility Compliance Evaluations* and contemporaneously preparing and retaining evaluation reports;

(h)    Preparing compliant *Exceedance Response Reports* in the event that storm water sampling data confirms an annual exceedance of any sampling parameter within the specified time limits, and certifying and submitting the reports to SMARTS;

(i)     Preparing complete and accurate *Annual Reports* and certifying and submitting them to SMARTS; and

(j)     Establishing a *Pollution Prevention Team* of at least two on-site employees and ensuring that the Team remains fully trained on all aspects of compliance with the General Permit.

SWPPP and Site Map Requirements

51.     All Dischargers are required to develop and implement a Storm Water Pollution Prevention Plan.

52.     The main objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the Discharger's facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

53.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised within ninety (90) days when there are routine revisions to be made; and within thirty (30) days whenever the SWPPP requires significant revisions. General Permit § X(B)

54.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP when necessary, is a violation of the General Permit. General Permit §§ I(J)(68), II(B)(3)(a), X(A), X(B), General Permit Fact Sheet § I(1)

55.     Among other requirements, the SWPPP must include: a detailed description of the facility's industrial processes and operations; identification of a pollution prevention team; a site map; a list of industrial materials handled and stored at the site, including the locations where each material is stored, received, shipped, and handled, as well as the typical quantities and handling frequency; a description of potential pollutant sources; an assessment of potential

pollutant sources (specifically, whether the pollutants have the potential to commingle with storm water);  a monitoring implementation plan, including a discussion of facility drainage, drainage areas, and discharge points and sampling locations; all mandatory sampling parameters; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges.   General Permit §§ X(A)-X(I)

56.    The General Permit also requires that SWPPPs include detailed BMP Descriptions and a BMP Summary Table.  General Permit § X(H)(4), (5)

57.    Site Maps are required to depict the following: the facility boundary, storm water drainage areas, storm water flow direction, on-site surface water bodies and/or locations of nearby water bodies, municipal storm drain inlets that receive storm water discharges, locations of storm water collection and conveyance systems, associated discharge locations, sampling locations, locations and descriptions of structural control measures, identification of all impervious areas, locations where materials are directly exposed to precipitation, locations where significant spills or leaks have occurred, and all areas of industrial activity, including industrial storage areas.  General Permit § X(E)

Best Management Practices

58.    The General Permit requires all Dischargers to implement and maintain the following minimum Best Management Practices to reduce or prevent pollutants in industrial storm water discharges at their facility: Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program, and Quality Assurance and Record Keeping. General Permit § X(H)(1)

59.    The General Permit further requires Dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization

BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. General Permit § X(H)(2)

60.     Failure to implement minimum and advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. General Permit Fact Sheet §I(I)(2)(o)

<u>Monitoring and Reporting/Storm Water Sampling and Analysis</u>

61.     The General Permit requires Dischargers to develop and implement an adequate Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

62.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce storm water discharges, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

63.     Section XI(B) of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the facility SWPPP.

64.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area. General Permit §XI(B)(2)

65.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload to SMARTS the resulting laboratory reports within 30 days from receipt of the report. General Permit §§ XI(B)(8), XI(B)(11)

66.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, all additional parameters indicated in the Permit by facility type (standard industrial classification code), and all parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit § XI(B)(6)(c)

67.     Facilities are also required to conduct monthly and sampling event visual observations.   Monthly visual observations are conducting during dry weather and must include observing each drainage area for the presence of non-storm water discharges; as well as inspecting outdoor industrial equipment and storage areas, outdoor industrial activities areas, and all other potential sources of industrial pollutants, and monitoring BMPs for effectiveness. Sampling event visual observations are conducted at the same time as sampling occurs at a discharge location and must include observing storm water discharges for the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris and sources of any discharge pollutants.  General Permit § XI(A)

68.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair or contribute to impairing water quality or affect human health from ingestion of water or fish.

69.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks.  The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

70.     The NALs established under the General Permit for pollution parameters applicable to all Dischargers are set forth in Table 2, which is incorporated herein by reference.

NAL Exceedances-Exceedance Response Actions

71.    An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than the annual NALs, which are listed on Table 2 of the General Permit.  The reporting year runs from July 1 to June 30.

72.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A), Table 2

73.    When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status" commencing July 1 of the reporting year following the entry into Level 1 status.

74.    Once a Discharger has entered Level 1 Status, by October 1 following commencement of Level 1 status, it must conduct a thorough facility evaluation with the assistance of a Qualified Industrial Stormwater Practitioner (QISP) of all drainage areas to determine the industrial pollutant sources at the facility that are or may be related to the exceedance(s), and identify the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future exceedances.   General Permit § XIII(C)

75.    By January 1 following commencement of Level 1 status, the Discharger must revise its SWPPP, implement any additional BMPs identified in the evaluation, and certify and submit to SMARTS a Level 1 Exceedance Response Action (ERA) Report.  General Permit § XIII(C)

76.    If a discharger exceeds an applicable NAL during Level 1 Status, it is elevated to "Level 2 Status."  General Permit §XII(D)

77.    On January 1 of the reporting year following entry into Level 2 Status, a Discharger is required to submit to SMARTS a Level 2 ERA Action Plan identifying its selection of one of three options to remediate the continuing exceedances: implementation of additional BMPs, a determination that the exceedance is solely due to non-industrial pollutant

sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. The Action Plan must also include a schedule for completion of the tasks. General Permit § XII(D)(1)

78.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, the Discharger is required to submit a Level 2 Technical Report demonstrating its efforts to implement the additional BMPs or confirming the non-industrial sources of the pollutants causing the exceedances. General Permit § XII(D)(2)

### Annual Comprehensive Facility Evaluation

79.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit § XV

### Annual Reports

80.    Section XVI(A) of the General Permit requires all Dischargers to certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year.

81.    Annual Reports are auto populated by SMARTS from Dischargers' answers to a series of twelve questions, which require mostly yes/no responses.

82.    The questions include whether the Discharger has conducted monthly visual observations, collected and analyzed the required number of storm water samples from all discharge locations at its facility; and where the facility is located within an impaired watershed, the Discharger has assessed whether any of the receiving water impairments are potential pollutants present at their facility.

83.    Any "no" responses to the above questions require a complete and accurate explanation, certified under penalty of law.

### Certification of Compliance Documents

84.    Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally

Responsible Party (LRP) or Duly Authorized Representative (DAR) of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

### B. Central Valley Region Basin Plan

85.    The Regional Water Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," generally referred to as the Basin Plan, and the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

86.    The beneficial uses of these waters include, among others, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

87.    The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

88.    The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

89.    The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

90.    The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

91.    The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

92.    The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

93.    The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

94.    The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

95.    Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L.

## VI.  SPECIFIC FACTUAL ALLEGATIONS

### A.  The Facility

96.     AES Sunoptics, located at 6250 27th Street in Sacramento, California, is a facility that manufactures and distributes skylights and daylighting systems.

97.     Plaintiff is informed and believes that the facility falls under standard industrial classification ("SIC") code 2821-plastics materials and resin manufacturing and/or 3999-manufacturing industries, not otherwise specified, based on public records.

98.     SIC Codes 2821 and 3999 are both included in Attachment A of the General Permit as types of industrial operation that require application for and receipt of General Permit coverage.

99.     Defendant AES Sunoptics stores and handles industrial chemicals and materials outdoors that are exposed to storm water, eroded by wind, and otherwise contaminate the surrounding watershed.

100.     During rain events, storm water flows over the surface of the Facility where industrial activities occur and areas where airborne materials associated with the industrial processes at the Facility settle onto the ground.

101.     Storm water flowing over these areas collects suspended sediment, dirt, metals, and other chemicals and toxic pollutants as it flows towards the Facility's storm water channels, and discharges from the Facility into its Receiving Waters.

102.     Based on the foregoing, Plaintiff alleges that Defendant AES Sunoptics is required to maintain standard General Permit coverage and is not eligible to apply for or receive either No Exposure Certification (NEC coverage) or Notice of Non-Applicability (NONA coverage).

### B.  The Facility's Receiving Waters

103.     Based on Plaintiff's investigation, including but not limited to a review of the Defendant AES Sunoptics' Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"); SWPPP and Site Map, aerial photography and drone footage; federal, state and

local regulatory agency mapping tools; and eyewitness reports, storm water leaves the boundaries of Defendant's facility and enters Morrison Creek, via both the City of Sacramento MS4 and surface flow, before discharging to the Sacramento River, a navigable Water of the United States.

104.    On January 13, 2023, Defendant AES Sunoptics certified under penalty of law to the Water Board and the general public via SMARTS that storm water discharges from the facility enter Morrison Creek.  (See **Exhibit B**, attached hereto and incorporated herein by reference)

105.    Plaintiff alleges that the Best Management Practices at Defendant AES Sunoptics' facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to Waters of the United States.

C.    **Defendants' General Permit Violations**

Deficient SWPPP/Failure to Follow SWPPP

106.    Plaintiff alleges that since at least January 1, 2023, Defendant AES Sunoptics has failed to implement an adequate SWPPP for the facility and has failed to comply with the terms of its deficient SWPPP, in violation of the standard conditions of the General Permit.   General Permit §§ I(J), II(A)(1), II(B)(1)(b), II(B)(3), X, XXI(A), XXI(K)(1), XXI(L); General Permit Fact Sheet § II(I)(1); 33 U.S.C. § 1365(f)(7)

107.    Defendants' continuing failure to implement and follow an adequate SWPPP is evidenced by documents uploaded and certified to SMARTS under penalty of law by AES Sunoptics, as well as by required documents which have not been uploaded to SMARTS.

108.    Defendants' continuing failure to implement an adequate SWPPP is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

109.    As is more particularly described in **Exhibit A,** attached hereto and incorporated herein by reference, Plaintiff's Notice Letter issued to Defendants delineated numerous

deficiencies in Defendants' SWPPP and Site Map uploaded to SMARTS on January 11, 2023 ("prior SWPPP").

110.    The 60-day notice period on Plaintiff's Notice Letter expired on November 3, 2024, without either partial or full correction of any of the violations alleged in the Notice Letter.

111.    In anticipation of the filing of this lawsuit, and in a last-minute attempt to moot the alleged SWPPP deficiency violation, Defendant AES Sunoptics uploaded to SMARTS a revised SWPPP on November 27, 2024 ("current SWPPP").

112.    Defendant AES Sunoptics' November 27, 2024, SWPPP and Site Map remain deficient in all the ways specified in the Notice Letter attached hereto as **Exhibit** A that Plaintiff alleged Defendant's prior SWPPP dated January 11, 2023, was deficient.

113.    Specifically, Defendant AES Sunoptics' current SWPPP uploaded to SMARTS on November 27, 2024, remains deficient and out of compliance with Section X of the General Permit for failure to include the following:  (a) complete and accurate Pollutant Source Assessment and Industrial Material Inventory List [violation of General Permit §§ X(F), X(G) and XI(B)(6)]; (b) all mandatory sampling parameters [violation of General Permit § XI(B)(6)]; (c) sufficient detail regarding Facility operations and industrial processes [violation of General Permit § X(G)(1)]; and (d) accurate discussion and depiction of Facility drainage, discharge locations and sampling points [violation of General Permit §§  X(I) and X(G)(1)(e)].

114.    Plaintiff is informed and believes, and thereupon alleges, that Defendant AES Sunoptics' prior and current SWPPP and Site Map do not include sufficient information to comply with the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

115.    According to information available to Plaintiff, Defendant AES Sunoptics' prior and current SWPPP have not been evaluated to ensure effectiveness and have not been revised as required by the General Permit to reflect true conditions at the Facility and to prevent discharges of contaminated storm water.

116.     According to information available to Plaintiff, Defendant AES Sunoptics' prior and current SWPPP and Site Map contains misleading, false or insufficient information regarding facility operations and processes; drainage, drainage areas and storm water flow; discharge locations and mandatory sampling points; the type, amount and location of industrial materials and chemicals handled at the facility; and all mandatory required sampling parameters associated with the facility's industrial materials and chemicals.

117.     Plaintiff alleges that Defendant AES Sunoptics' prior and current SWPPP and Site Map do not set forth site-specific Best Management Practices (BMPs) for the Facility that are consistent with BAT or BCT.

118.     Plaintiff is informed and believes, and thereupon alleges, that Defendant AES Sunoptics has failed and continue to fail to alter the Facility's SWPPP/Site Map and site-specific BMPs to comply with the requirements of the General Permit.

119.     In addition, Plaintiff alleges that Defendant AES Sunoptics has failed to comply with the provisions of its prior and current SWPPP in the areas of monitoring and reporting.

120.     Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events into the Sacramento River.

121.     Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant AES Sunoptics' deficient SWPPP/Site Map are ongoing and continuous.

<u>Monitoring and Reporting/ Storm Water Sampling</u>

122.     Plaintiff alleges the monitoring and reporting program at Defendant AES Sunoptics' facility in Sacramento is deficient and in violation of the mandatory standard conditions of the General Permit.  General Permit §§ X, X(I), XI, XXI(A); General Permit Fact Sheet §§ II(I)(3)(a)(iii); 33 U.S.C. § 1365(f)(7)

123.    Defendant AES Sunoptics' deficient monitoring and reporting program is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant, as well as by required documents which have not been uploaded to SMARTS.

124.    Defendant AES Sunoptics' deficient monitoring and reporting program is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and government agencies, as well as other relevant documents maintained by Defendants and governmental and regulatory agencies.

125.    Since January 1, 2023, Defendant AES Sunoptics has failed to collect and analyze two storm water samples from the first half of each reporting year, and two storm water samples from the second half of each reporting year, as required by General Permit §XI(B).

126.    In addition, Defendant AES Sunoptics has failed to conduct monthly visual observations and stormwater sampling visual observations at the facility since at least January 1, 2023.

127.    Defendant AES Sunoptics has also collected samples of storm water discharges at the facility that failed to comply with the General Permit's requirement that samples be preceded by a 48-hour period without a discharge, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

128.    Defendant AES Sunoptics has failed to collect storm water samples from each drainage area at all discharge locations at its facility, for each QSE where sampling is performed, pursuant to General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

129.    Defendant AES Sunoptics has failed to analyze the facility's storm water samples for all required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

130.    Defendant AES Sunoptics has failed to deliver the facility storm water samples to a qualified Laboratory within 48 hours of collection, pursuant to Attachment H, Section 2 of the

General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

131.    Defendant AES Sunoptics has failed to upload facility storm water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

<u>Incomplete/False Ad Hoc Monitoring Reporting</u>

132.    Since January 1, 2023, Defendant AES Sunoptics has failed to submit complete and accurate Ad Hoc Monitoring Reports to the Water Board in violation of General Permit § XI(B), as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

133.    Defendants' monitoring and reporting violations are continuous and ongoing at the facility.

<u>Falsification of Documents Submitted to the Water Board via SMARTS</u>

134.    Since January 1, 2023, Defendant AES Sunoptics has submitted to the Water Board inaccurate and/or falsified Annual Reports, as well as a false Representative Sampling Reduction certificate, in violation of the standard conditions of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General Permit §§ II(A)(1), XI(A)(C), XVI, XXI(K), XXI(L), XXI(N); General Permit Fact Sheet § II(O); 33 U.S.C. § 1365(f)(7)

135.    Defendants' submission of false reports and certifications and continuing failure to retract its false statements to the Water Board and the general public is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant AES Sunoptics.

136.    Defendants' submission of false Annual Reports is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by

Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

137.    Defendants' submission of false statements to the Water Board and the general public is ongoing and continuous.

Failure to Implement BAT/BCT; BMP Deficiencies

138.    Since at least January 1, 2023, Defendant AES Sunoptics has failed to identify and implement Best Management Practices ("BMPs") at the Facility which comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, and best available technology (BAT) for toxic and non-conventional pollutants.

139.    These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

140.    Defendants' failure to implement proper minimum BMPs is in violation of the standard conditions of the General Permit.   General Permit §§ I(C), V(A), X, XXI(A); General Permit Fact Sheet §§ II(I)(2)(o); 33 U.S.C. § 1365(f)(7)

141.    Defendant AES Sunoptics' BMP deficiencies are evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant AES Sunoptics, as well as by required documents which have not been uploaded to SMARTS.

142.    Defendant AES Sunoptics' BMP deficiencies are also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies, including the National Oceanic and Atmospheric Association (NOAA).

143.    Defendant AES Sunoptics' BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

144.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the facility to the Sacramento River.

<u>Failure to Comply with Required Exceedance Response Actions</u>

145.    Since January 1, 2023, Defendant AES Sunoptics has failed to comply with required Exceedance Response Actions, in violation of both the discharge prohibition and standard conditions of the General Permit.  General Permit §§ I(D), I(C), I(K)(70), I(K)(77), III, V(A), VI, X, X.I, XI, XII, XXI(A); 33 U.S.C. § 1365(f)(7)

146.    Defendant AES Sunoptics' failure to comply with the General Permit's required Exceedance Response Actions is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant AES Sunoptics, as well as by required documents which have not been uploaded to SMARTS.

147.    On July 1, 2023, Defendant AES Sunoptics  was elevated to Level 1 Status for exceedances of Aluminum and Magnesium, which occurred during the prior reporting year.

148.    Pursuant to Section XII of the General Permit, Defendant AES Sunoptics' Level 1 Exceedance Response Action (ERA) Report was due to be prepared and uploaded into SMARTS by January 1, 2024.

149.    While the Level 1 ERA Report first became due on  January 1, /2024, Defendant AES Sunoptics' obligation to prepare and upload a compliant ERA Report to SMARTS has never been extinguished.

150.    As is evidenced by Section I(K)(77) of the General Permit and the Compliance Flow Chart extracted from the General Permit (incorporated herein by reference), failure to submit a compliant Level 1 ERA Report following annual average exceedances of any sampling parameter is a per se violation of the General Permit that continues until the required Report is prepared and submitted to SMARTS.

151.    To date, Defendant AES Sunoptics has failed to prepare and submit to SMARTS a Level 1 ERA Report, which Plaintiff alleges is a continuing ongoing violation of both the

discharge prohibitions and the standard conditions of the General Permit, which violations

Plaintiff alleges have been in effect since

Discharges of Contaminated Storm Water

152.    Since at least January 1, 2023, Defendant AES Sunoptics has discharged

contaminated storm water from its facility in violation of the absolute discharge provisions and

the standard conditions of the General Permit, as is more particularly described herein, as well as

in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.  General

Permit §§ I(D), I(C), I(K)(77), III, V(A), VI, X, X.I, XI, XXI(A); General Permit Fact Sheet §§

II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b); 33 U.S.C. § 1365(f)(7)

153.    Defendants' discharges of contaminated storm water in violation of the General

Permit are evidenced by documents uploaded and certified to SMARTS under penalty of law by

Defendant AES Sunoptics, as well as by required documents which have not been uploaded to

SMARTS.

154.    Defendants' discharges of contaminated storm water in violation of the General

Permit are also evidenced by eyewitness reports and inspections conducted by representatives of

Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents

maintained by Defendants and governmental/regulatory agencies, including the National Oceanic

and Atmospheric Association (NOAA).

155.    Information available to Plaintiff indicates that unauthorized non-storm water

discharges occur at the Facility due to inadequate BMP development and/or implementation

necessary to prevent these discharges, as is more particularly described in the Notice Letter

attached hereto as **Exhibit A** and incorporated herein by reference.

156.    Due to the nature of the operations at Defendant AES Sunoptics' facility, coupled

with the documented lack of proper BMP implementation and unauthorized non-storm water

discharges, Defendants is discharging storm water containing excessive levels of pollutants

specific to its operation during at least every significant local rain event.

157.     Defendants has repeatedly failed and refused to include accurate information in the Facility's SWPPP regarding industrial operations, processes and materials, as well as locations where sampling and monitoring are required; and Defendant AES Sunoptics has failed to test Facility storm water runoff samples for all required parameters, resulting in unmonitored pollutants freely flowing from the Facility into the Sacramento River and its tributaries.

158.     Specifically, Plaintiff is informed and believes, and on that basis alleges, that the unmonitored pollutants being discharged by the Facility include Aluminum, Magnesium, Chromium, Cadmium, Copper, Lead, Chemical Oxygen Demand (COD) and Zinc.

159.     In addition, Defendant AES Sunoptics' self-monitoring Ad Hoc Reports evidence certified and submitted to SMARTS evidence exceedances of monitored parameters, including Aluminum, Magnesium, Total Suspended Solids, Copper, Zinc, pH and Cadmium, as is more particularly described in Plaintiff's Notice Letter attached hereto as **Exhibit A**.

160.     While exceedances of the Numeric Action Limits set forth in Table 2 of the General Permit are not in and of themselves violations of the General Permit, when coupled with BMP deficiencies and/or violations of the required Exceedance Response Actions, the exceedances are transformed into per se violations of the General Permit.   (See Compliance Flowchart; General Permit §§ I(K)(70), I(K)(77), V(A), XII; General Permit Fact Sheet §§ II(I)(3)(a)(iii), II(I)(2)(o), II(K)(2)(b)

161.     As set forth above, Defendant AES Sunoptics has failed to comply with required Exceedance Response Actions and has failed to implement and maintain required Best Management Practices.

162.     Defendants' discharges of contaminated storm water in violation of the General Permit is ongoing and continuous.

Failure to Train Employees

163.     Since at least January 1, 2023, Defendant AES Sunoptics has failed to implement and train a Pollution Prevention Team at the facility, in violation of the standard conditions of

the General Permit.   General Permit §§, I(K)(70), I(K)(77), I(I)(63), IX(A)(3), X(D), XXI(A), 33 U.S.C. 1365(f)(7)

164.    The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

165.    Defendants' failure to implement and train a Pollution Prevention Team in violation of the General Permit is evidenced by documents uploaded and certified to SMARTS under penalty of law by Defendant AES Sunoptics, as well as by required documents which have not been uploaded to SMARTS.

166.    Defendants' failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by eyewitness reports and inspections conducted by representatives of Plaintiff, Defendants and governmental/regulatory agencies, as well as other relevant documents maintained by Defendants and governmental/regulatory agencies.

167.    Defendants' failure to implement and train a Pollution Prevention Team in violation of the General Permit is also evidenced by Defendants' ongoing and continuing General Permit violations.

168.    Other evidence of Defendants' failure to implement and train a Pollution Prevention Team includes the fact that previously designated Team Members have left the Facility and have been replaced without being trained, as well as that some of the designated Pollution Prevention Team Members are regional employees not assigned to work at the Sacramento AES Sunoptics Facility.

169.    In addition, Defendants was required to have a Qualified Industrial Stormwater Practitioner (QISP) conduct training of the Facility's Pollution Prevention Team after it entered Level 1 Status on July 1, 2023, and to date has failed to do so.

170.    Defendants' failure to implement and train a Pollution Prevention Team in violation of the General Permit is ongoing and continuous.

**D. Informational Injuries Caused by Defendants' General Permit Violations**

171.    In addition to harming the aesthetic and recreational interests of Plaintiff's members with standing in this matter, Defendants' violations of the standard conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendants' compliance with standard conditions of California's Industrial General Permit, which provisions have been instituted by relevant regulatory agencies for the purposes of protecting the Waters of the United States.

172.    As set forth in more detail herein, Defendants has failed and refused to comply with all mandatory standard conditions of the General Permit, including maintaining a deficient SWPPP which includes objectively false information related to drainage, outdoor handling of industrial materials and storm water flow/sampling locations; failing to collect and analyze the required number of storm water samples; failing to test storm water samples for the proper parameters; and providing incomplete and false information in Annual Reports.

173.    Defendants' failure to comply with the standard conditions of the General Permit as set forth above have prevented Plaintiff's members with Article III standing from: (a) accessing on SMARTS the true operational facts relevant to Defendants' facility; and (b) acquiring accurate and complete data related to the unmonitored pollutants emanating from Defendants' facility during rain events and discharging into the facility's Receiving Waters.

174.    As such, Plaintiff's members with Article III standing are unable to fully assess the extent of Defendants' General Permit violations, as well as the types and levels of pollutants entering the affected waterways due to Defendants' willful violations of the standard conditions of the General Permit; or to even gauge the potential health ramifications to themselves should they continue to recreate in the affected waterways.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

175.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

176.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP, including a Site Map.

177.    As outlined herein, Defendants have failed to develop and implement an adequate SWPPP for Defendant AES Sunoptics' facility.

178.    Each day since January 1, 2023 that Defendants have failed to develop, implement and update an adequate SWPPP for the facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a), against all Defendants.

179.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and upload to SMARTS a compliant SWPPP and Site Map.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

180.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

181.    The General Permit requires Dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

182.    As outlined herein, Defendants have failed to develop and implement an adequate monitoring and reporting program for the AES Sunoptics facility.

183.    Each day since at least January 1, 2023, that Defendants have failed to develop and implement an adequate monitoring and reporting program for Defendant AES Sunoptics' facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

184.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop and implement a compliant monitoring and reporting program.

**THIRD CAUSE OF ACTION**
**Submission of Incomplete and False Annual Reports and Certifications to the**
**Regional Water Board and General Public**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

185.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

186.    Section XVI of the General Permit requires that Annual Reports and Certifications submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.  As delineated herein, Defendant AES Sunoptics made false representations in the Facility's Annual Reports and Sampling Frequency Reduction certification and have failed to correct or retract the false statements.

187.    Furthermore, Defendants have submitted incomplete Annual Reports and Ad Hoc Monitoring Reports, in violation of General Permit Sections XI(B) and XVI.

188.    Each time since January 1, 2023, that Defendants submitted false or misleading statements to the Water Board under penalty of perjury is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

189.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' failure to withdraw any of the false and/or incomplete Reports submitted to the Water Board.

**FOURTH CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

190.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.  The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require Dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Management Practices (BMPs), including Best Available Treatment (BAT) for toxic and nonconventional pollutants and Best Conventional Treatment (BCT) technologies for conventional pollutants.

191.    As alleged herein, Defendants have failed to implement BAT and BCT at the AES Sunoptics facility for discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

192.    As alleged herein, Defendants have failed to implement the required minimum Best Management Practices at the AES Sunoptics facility.

193.    Each day since at least January 1, 2023, that Defendants failed to implement the required minimum BMPs and to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act.  33 U.S.C. § 1311(a)

194.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate BMPs at its Facility.

**FIFTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

195.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

196.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

197.    Receiving Water VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

198.    Plaintiff is informed and believes, and thereupon alleges, that since at least January 1, 2023, Defendant AES Sunoptics has been discharging polluted storm water from its facility, in excess of applicable water quality standards in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

199.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants, becoming contaminated with pollutants associated with the industrial activity occurring at Defendant AES Sunoptics' facility.   The polluted storm water then flows untreated into the Sacramento River.

200.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan, in violation of Receiving Water Limitations of the General Permit.

201.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit. Furthermore, discharges of pollutants in excess of EPA benchmark values set forth in Table 2 of the General Permit are in violation of the General Permit when either (a) the Discharger has failed to comply with required Exceedance Response Actions; and/or (b) the Discharger has failed to implement and maintain required Best Management Practices.  Compliance Flowchart; General Permit §I(K)77)

202.    As alleged herein, Defendants have failed to comply with required Exceedance Response Actions and failed to implement and maintain required Best Management Practices at Defendant AES Sunoptics' facility.

203.    Every day since at least January 1, 2023, that Defendants have discharged and continue to discharge polluted storm water from Defendant AES Sunoptics' facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act.  33 U.S.C. § 1311(a)

204.    These violations are ongoing and continuous as of the date of the filing of this complaint, due to Defendants' continued failure to develop, implement and maintain adequate minimum BMPs at its Facility; failure to comply with required monitoring and reporting provisions of the General Permit; and failure to prepare and upload to SMARTS a compliant Level 1 Exceedance Response Report.

## SIXTH CAUSE OF ACTION
### Failure to Comply with Required Exceedance Response Actions
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)
### [Against All Defendants]

205.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

206.    The General Permit requires that all Dischargers who enter Level 1 or Level 2 status comply with specific Exceedance Response Actions delineated in Section XII of the General Permit.

207.    As herein alleged, Defendants have failed to date to comply with the Exceedance Response Actions required by the General Permit.

208.    Each day since January 1, 2023 that Defendants have failed to comply with the Exceedance Response Actions required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

209.    This violation is ongoing and continuous as of the date of the filing of this complaint, due to Defendant AES Sunoptics' continued failure to prepare and upload to SMARTS a Level 1 Exceedance Response Report, which violation renews every day until the Report has been submitted.

**SEVENTH CAUSE OF ACTION**
**Failure to Properly Train facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
**[Against All Defendants]**

210.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

211.    Section X(D)(1) of the General Permit requires each facility to establish a Pollution Prevention Team responsible for implementing the requirements of the General Permit. The facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

212.    Section X(H)(f) of the General Permit also requires that Dischargers ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

213.     Since at least January 1, 2023, Defendants have failed to properly implement and train a Pollution Prevention Team at Defendant AES Sunoptics' facility, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendants to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendants to immediately operate the AES Sunoptics facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendants from discharging pollutants to the surface waters surrounding its facility until such time as Defendant AES Sunoptics has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendants to pay civil penalties of $57,617.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendants to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.     Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and;

8.      Award such other and further relief as may be just and proper.

Dated:  February 4, 2025                    Respectfully,


                                            By: ___/S/ Adam D. Brumm_____
                                                Adam D. Brumm
                                                Attorney for Plaintiff

# EXHIBIT A



*Central Valley* Eden Environmental Defenders

September 4, 2024

Via US Mail, Certified and Email

Grant Gable         Email:  grant.grable@aessunoptics.com
Facility Manager
AES Sunoptics
6250 27th Street
Sacramento, CA 95822

Via US Mail

C T Corporation System
Agent for AES Sunoptics, Inc.
330 North Brand Boulevard, Suite #700
Glendale, CA  91203

Vikram Wasu
A-1 Distributing, Incorporated
6945 Power Inn Road
Sacramento, CA  95828

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of AES Sunoptics:

       This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC ("EDEN") to give legal notice that EDEN intends to file a civil action against AES Sunoptics, Inc., ("Discharger" or "AES Sunoptics"), A-1 Distributing Incorporated ("Property Owner"), and the respective corporate officers and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the AES Sunoptics facility located at 6250 27th Street in Sacramento, California ("the Facility" or "the site").

       EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, duck hunting, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against AES Sunoptics, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of AES Sunoptics to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against AES Sunoptics under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.    THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-0028-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around January 13, 2023, AES Sunoptics submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit

effective July 1, 2015. AES Sunoptics' assigned Waste Discharger Identification number ("WDID") is 5S34I030077.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, AES Sunoptics has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 Code of Federal Regulations §§122.22, 122.26; 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.     The Facility

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is AES Sunoptics' permanent facility address of 6250 27th Street in Sacramento, California.

AES Sunoptics is a Facility that manufactures and distributes skylights and daylighting systems. Facility operations are covered under Standard Industrial Classification Code(s) (SIC) 2821 - Plastics Materials and Synthetic Resins, and Nonvulcanizable Elastomers.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2821, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well Aluminum, Magnesium, Chromium, Cadmium, Copper, Lead, Zinc, and Chemical Oxygen Demand (COD).

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.     The Affected Receiving Waters

The Facility discharges into the Morrison Creek, a tributary of the Sacramento River ("Receiving Waters"). The Facility's Receiving Waters are impaired for Dissolved Oxygen, Group A Pesticides, Chlorpyrifos, Diazinon, Dieldrin, Dioxin, Furan, Mercury, Selenium, PCBs (Polychlorinated biphenyls), Electrical Conductivity, DDT (Dichlorodiphenyltrichloroethane), and Chlordane.

The Sacramento River is a water of the United States.  The CWA requires that water bodies such as the Sacramento River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region.  The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants.  Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.  *Deficient SWPPP and Site Map*

AES Sunoptics' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map dated January 11, 2023, for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

1.    The Site Map does not include all minimum required components for Site Maps as indicated in Section X.E of the General Permit as follows:

A.  An accurate depiction of all storm water drainage areas within the Facility boundary;

B.  Accurate storm water flow direction of each drainage area;

C.  At least one sampling location for every drainage area;

D.  Sampling points which are representative of facility operations;

E.  Locations of all storm water collection and conveyance systems associated with discharge locations and the accurate flow direction (i.e. storm drain inlets, v-ditches, and underground conveyances);

    F.   Municipal storm drain inlets which receive the Facility's industrial storm water discharges and authorized non-storm water discharges (IGP Section X.E.3.a);

    G.   Nearby water bodies such as rivers, lakes and creeks; and

    H.   Identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures.

2.      The SWPPP does not include all the required elements, as indicated below:

    A.   The Facility WDID number (Section X.A.1);

    B.   A complete and detailed list of all **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

    C.   A detailed, accurate and complete discussion of **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (Section X.G.1.a);

    D.   An accurate and complete description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

    E.   A **BMP Summary Table** summarizing each BMP currently being implemented at the Facility; the associated industrial pollutant the BMP is designed to reduce or prevent; the frequency, times of day or conditions when the BMP is scheduled for implementation; the individual and/or position responsible for implementing the BMP; the procedures, equipment and/or tools necessary to implement the BMP effectively; the locations within each area of industrial activity where the BMP is to be implemented; and the frequencies of implementation (IGP Sections X.H.4 and X.H.5);

F.   An identification of all **Non-Storm Water Discharges** (**NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.1.e);

G.   A discussion of the BMPs the Facility will implement to prevent **rinse/wash waters**, cooling tower piped blowdown or other industrial materials from entering the storm water conveyance system and to ensure that all facility areas impacted by cooling tower discharges are cleaned as soon as possible (Section X.H.1.a);

H.   An evaluation of the areas of the Facility where **spills and leaks** are likely to occur (IGP Section X.G.1.d.i);

I.   An appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a detailed and accurate description of all discharge locations, a discussion of Visual Observation procedures and procedures for field instrument calibration instructions (Section X.I);

J.   An adequate and accurate discussion of the **Facility's Receiving Waters** and associated impairments (Section XI.B.6.e, Section X.G.2.ix);

K.   A complete and accurate Pollutant Source Assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the Facility likely to come into contact with stormwater (Section XI.B.6);

EDEN's investigation confirms that Aluminum, Magnesium, Chromium, Cadmium, Copper, Lead, Zinc, and Chemical Oxygen Demand (COD) are present in industrial operations at the Facility. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.

L.   An appropriate and complete discussion of **Drainage Areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section X.I);

M.   The **Representative Sampling Reduction** justification does not comport with Section XI.C.4 of the General Permit;

N.   A discussion of whether the Facility is subject to 40 CFR Subchapter N ELGs, or incorrectly states that the Facility is not subject to the ELGs;

O.   The SWPPP fails to specify that the Facility is subject to Section XVIII of the General Permit (special requirements for facilities which handle **plastic**

**materials**) and further fails to incorporate the required additional BMPs;

P.   A discussion of **Exceedance Response Actions**;


Q.   A discussion of the requirement for the Facility to file an **Annual Report** no later than July 15th of each reporting year (IGP Section XVI); and

R.   A sample **Chain of Custody Form**.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.   *Failure to Comply with Facility SWPPP*

The Facility's current SWPPP dated January 11, 2023 indicates that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed below, the Facility failed to collect the required number of storm water samples during the reporting year 2023-2024.

The Monitoring Implementation Section of the Facility's SWPPP identifies the parameters for which the Facility's storm water run-off samples must be analyzed, including pH, oil & grease, Total Suspended Solids, Zinc and Aluminum.

As specified below, the storm water run-off samples the facility analyzed and uploaded into the SMARTS system for samples collected during reporting years 2022-2023 and 2023-2024, failed to include sample analyses for the required parameter of Aluminum, as identified in the SWPPP.

Section X.H.g of the General Permit requires all Dischargers to develop and implement management procedures to ensure that appropriate staff implements all elements of the Facility's SWPPP, including the Monitoring Implementation Plan.

### C.   Failure to Comply with General Permit Requirements for Handling Plastics

AES Sunoptics has failed to comply with Section XVIII of the General Permit, which provides that all facilities covered under the General Permit which manufacture, transport, store or consume plastic materials are required to implement additional Best Management Practices (BMPs) to eliminate discharges of plastic in storm water, in addition to the other requirements of this General Permit applicable to all other industrial materials and activities.

Plastic materials include virgin and recycled plastic resin pellets, powders, flakes, powdered additives, regrind, dust, and other similar types of preproduction plastics with the potential to discharge or migrate off-site.

Facilities which handle plastic materials are required to install, at each on-site storm drain down gradient of areas containing plastic material, a containment system designed to trap all particles retained by a 1mm mesh screen, with a treatment capacity of no less than the peak flow rate from a one-year, one-hour storm.

Facilities which handle plastic materials smaller than 1mm in size must develop a containment system designed to trap the smallest plastic material handled at the facility with a treatment capacity of at least the peak flow rate from a one-year, one-hour storm, or develop a feasible alternative BMP or suite of BMPs that are designed to achieve a similar or better performance standard that shall be submitted to the Regional Water Board for approval.

Plastics facilities must also use durable sealed containers designed not to rupture under typical loading and unloading activities at all points of plastic transfer and storage; utilize capture devices as a form of secondary containment during transfers, loading, or unloading plastic materials; and must have a vacuum or vacuum-type system available for quick cleanup of fugitive plastic material available for employees.

If a containment system is not feasible, the facility must implement all eight of the BMPs specified in Section XVIII.A.2.b.

AES Sunoptics' facility manufactures and distributes skylights and daylighting systems and handles pre-production plastics in its production processes.

From a review of the Facility's current SWPPP, as well as other information available to EDEN, AES Sunoptics has apparently failed to date to install and maintain the required containment system or to implement the required BMPs.

### D. *Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit*

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions,

Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations and Maintain Required Records/Reports

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Section XI.A.3 required all Dischargers to complete contemporaneous records of all visual observations.  The records at a minimum must include the date, approximate time of the observation, the locations observed, the presence and probable source of any observed pollutants, the name of the person who conducted the observation, and any response actions and/or additional SWPPP revisions necessary to be taken in response to the visual observations.

Section XXI.H provides that Dischargers must produce copies of visual observation records to regulatory agencies upon request; and Section XXI.J.5 provides that Dischargers must retain either paper or electronic copies of visual observation records for at least five (5) years.

EDEN believes that between January 9, 2023, and the present, AES Sunoptics has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2. Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that AES Sunoptics has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an appropriate and accurate explanation must be included in the Annual Report.

As of the date of this Notice, AES Sunoptics has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting year 2023-24, and has not provided an adequate or accurate explanation for its failure to do so.

Furthermore, pursuant to data collected from the National Oceanic and Atmospheric Administration ("NOAA"), there were sufficient storm events occurring near 6250 27th Street in Sacramento during Facility operating hours within the reporting years where required stormwater sample collections were missed to have allowed the Facility to collect at least the minimum number of storm water samples required by the General Permit.

3.    Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

AES Sunoptics' stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date |
| --- |
| 1/9/2023 |
| 2/24/2023 |
| 2/19/2024 |

4.    Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection

Pursuant to General Permit Section XI.B.8, referring to Attachment H to the General Permit, Dischargers must deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  AES Sunoptics' storm water runoff samples listed below were not delivered to the Facility's Laboratory Alpha Analytical Laboratories, Inc. in that time frame:

| Sample Date | Date/Time Laboratory Received Sample |
| --- | --- |
| 2/24/2023 9:00 | 2/28/2023 8:30 |
| 4/13/2024 9:45 | 4/16/2024 22:00 |

5.  Failure to Accurately Report Sampling Data via SMARTS Ad Hoc Reporting

AES Sunoptics has failed to fully comply with Section XI.B.11.a of the General Permit requiring all dischargers to report all sampling and analytical results to SMARTS within 30 days of receipt.

The Water Board requires Dischargers to utilize SMARTS' Ad Hoc Monitoring Reporting system to report sample analyses.  This process includes both entry into SMARTS of the raw analytical data pertaining to each storm water sample collected and analyzed during the reporting year, as well as attaching to the Ad Hoc Monitoring Report a PDF copy of the laboratory report received by the facility.

AES Sunoptics failed to accurately enter into the SMARTS Ad Hoc Reporting system the raw analytical data for the storm water samples collected between January 9, 2023, and the present.  Specifically, the Facility failed to report Boron, Aluminum, Chromium, Magnesium, Cadmium, Copper, and Lead, from the lab analyses conducted by Alpha Analytical Laboratories, Inc.

Additionally, the Ad Hoc Monitoring Report for the storm water sample collected on April 13, 2024, was never submitted to SMARTS.

Failure to accurately report all storm water sample analyses to SMARTS constitutes false reporting to a regulatory agency in violation of the standard conditions of the General Permit outined in Sections XXI.L, XXI.N, XXI.O and XXI.Q.

In addition, failure to accurately enter sampling data into SMARTS can result in the inability of SMARTS to recognize when a Discharger enters into Level 1 or Level 2 Exceedance Response Status, as is the case here.

Specifically, this Facility entered into Level 1 Exceedance Response Status on July 1, 2023, for Aluminum, Magnesium, and TSS.  On July 1, 2024, the facility entered into Level 2 Exceedance Response Status for Magnesium.

6.  Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

AES Sunoptics failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

60-Day Notice of Intent to Sue
AES Sunoptics
September 4, 2024
Page 12 of 26

| Sample Date | Lab Report Receipt Date | Date Uploaded into SMARTS |
|---|---|---|
| 2/24/2023 9:00 | 3/15/2023 6:47 | 7/6/2023 |
| 12/27/2023 16:34 | 1/19/2024 11:52 | 5/7/2024 |

7. Failure to Collect Samples From Each Drainage Area at all Discharge Locations

Section XI.B.4 of the General Permit requires Dischargers to collect samples from all discharge locations at all drainage areas, regardless of whether the discharges are substantially similar.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location." (Attachment C to General Permit-Glossary) EDEN's investigation confirms that there are at least 6 drainage areas at AES Sunoptics' facility, with at least 6 corresponding discharge locations.

The storm water runoff sample analyses AES Sunoptics uploaded for samples collected on the dates listed below failed to include samples from all discharge locations at the Facility:

| 1/9/2023 |
|---|
| 2/24/2023 |
| 12/27/2023 |
| 2/19/2024 |
| 4/13/2024 |

8. Failure to Analyze Storm Water Samples for All Required Parameters

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type: pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

AES Sunoptics' SWPPP includes Aluminum and Zinc as mandatory sampling parameters, based on the Pollutant Source Assessment contained in the SWPPP. Additionally, the Facility is currently analyzing storm water samples for Boron, Aluminum, Magnesium, Chromium, Cadmium, Copper, Lead, and Zinc, in addition pH, TSS and O&G.

Section XI.B.6.e of the General Permit requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix. Test methods with lower detection limits may be necessary when discharging to receiving waters with 303(d) listed impairments or TMDLs.  AES Sunoptics' receiving waters are impaired for dissolved oxygen, which is associated with the indicator parameters Chemical Oxygen Demand and Biological Oxygen Demand.

EDEN's investigation confirms that the following additional parameter must be included in the Facility's sampling process, as it is associated with AES Sunoptics' industrial operations: Chemical Oxygen Demand (COD).

The storm water runoff sample analyses AES Sunoptics uploaded for samples collected on the dates listed below failed to include all required additional sampling parameters as outlined above.

| |
|---|
| 1/9/2023 |
| 2/24/2023 |
| 12/27/2023 |
| 2/19/2024 |
| 4/13/2024 |

### E.  _False/ Deficient Annual Reports Submitted to the Water Board_

Section XXI.L of the General Permit provides as follows:

### L. Certification

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

_"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."_

AES Sunoptics has failed to comply with Sections XVI.A, XXI.L and XXI.N of the General Permit by failing to submit complete and accurate Annual Report(s) to the Regional Water Board for the reporting year 2023-24.

<u>False Information Re: Failure to Collect the Required Number of Stormwater Samples</u>

AES Sunoptics' Annual Reports for the reporting year 2023-24 included Attachment 1 as an explanation for why AES Sunoptics failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the applicable reporting year(s) for all discharge locations, in accordance with Section XI.B.

Grant Gable certified in the Report, under penalty of perjury, that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges during the reporting year(s) and scheduled facility operating hours;

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow AES Sunoptics to have collected the requisite number of samples.

Thus, AES Sunoptics' Annual Report submitted to the Regional Water Board through the SMARTS system on July 16, 2024, did not contain an acceptable reason why the Facility failed to collect the appropriate number of stormwater samples. Further, the Facility did not provide documentation supporting the alleged lack of discharge.

<u>False Information re: Discharge Locations</u>

Grant Gable certified in the Facility's Annual Reports for the reporting years 2022-23 and 2023-24 submitted to the Regional Water Board through the SMARTS system on July 6, 2023, and July 16, 2024, that the Facility has only 2 discharge locations when in fact 6 discharge locations are present at the AES Sunoptics facility.

<u>False Information re: Representative Sampling Reduction</u>

Grant Gable certified in the Facility's Annual Reports for the reporting years 2022-23 and 2023-24 submitted to the Regional Water Board through the SMARTS system on July 6, 2023, and July 16, 2024, that the Facility had not reduced the number of sampling locations

within a drainage area in accordance with the Representative Sampling Reduction in Section XI.C.4.

However, AES Sunoptics SWPPP certified on January 11, 2023, does in fact include a Representative Sampling Reduction Sampling justification for Drainage Areas A, C, and D. Subsequently, the Facility has in fact reduced the number of sampling locations within the aforementioned drainage areas.

Thus, AES Sunoptics' Annual Reports submitted to the Regional Water Board through the SMARTS system as specified above contained objectively false information.

### F. *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that AES Sunoptics has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

AES Sunoptics' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

EDEN has recently observed the facility and obtained evidence of the following ongoing BMP deficiencies:

- Significant outdoor exposure of raw materials placed on ground surface without any BMPs to mitigate storm water exposure;
- Significant tracking of white material and residue observed around the entire facility, especially in the SE area of facility;
- Plastic, trash and other debris accumulation around the facility, particularly noticeable near DP-5;
- White and brown chemical residue at NE portion of the facility, exiting the v-ditch and out the facility's entrance;
- NE cooling tower observed leaking;

- Brown paint or otherwise chemical spill observed in the NE area and entering v-ditch;
- Iron oxide residue observed on the pavement and around the trash bins;
- Debris observed accumulating in the loading dock pit; and
- Brown dust or residue observed on the ground surface in the SW strip portion of the facility.

### G. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

### 1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit. The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

AES Sunoptics' exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit. EDEN alleges and notifies AES Sunoptics that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

AES Sunoptics' ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility.  EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

AES Sunoptics' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

**2.**  Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations.  Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan.  Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the

Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Sacramento River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

• All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below. These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts AES Sunoptics on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations. The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of

Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least January 9, 2023 to the present, AES Sunoptics has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, AES Sunoptics' sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for Sacramento River.

Further, AES Sunoptics has failed to comply with Section XX.B of the General Permit. Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2022-23** | | | |
| 1/9/2023 | DS-2 | Aluminum | 5.700 |
| | | Cadmium | 0.00091 |
| | | Copper | 0.084 |
| | | Zinc | 0.79 |
| | DS-4 | pH | 8.90 |
| | | | |
| 2/24/2023 | DS-4 | Zinc | 0.11 |
| **Reporting Year 2023-24** | | | |
| 12/27/2023 | DS-2 | Copper | 0.0977 |
| | | pH | 6.20 |
| | | | |

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| 2/19/2024 | DS-2 | Copper | 0.00762 |
| | | Zinc | 0.2020 |
| | | pH | 8.80 |
| | DS-4 | Copper | 0.00741 |
| | | | |
| 4/13/2024 | DS-2 | pH | 8.70 |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on **Table 2 of the General Permit,** as well as the Maximum Contaminant Levels (MCLs) listed in the **California Code of Regulations, Title 22, Section 64431** (Table 64431-A) and the Water Quality Control Plan (**Basin Plan**) for the **California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

## H. Failure to Comply with Exceedance Response Action Requirements

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

Level 1 ERA Evaluation and Report

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous Numeric Action Level ("NAL") exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the Discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), and to do so by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.  Furthermore, the Evaluation must include all drainage areas at the facility.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1. The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed. The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address).

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

Level 2 ERA Action Plan

A Discharger will enter Level 2 status if there is an NAL exceedance of the same parameter occurring during the time the Discharger is in Level 1 status.

By January 1 following the reporting year during which the NAL exceedance(s) occurred, Dischargers in Level 2 status must certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance.

For each new Level 2 exceedance, the Level 2 Action Plan must select one of three available "demonstrations" the Facility will perform to address the exceedance(s). These demonstrations include:

(a) *Industrial Activity BMP Demonstration* (the Facility evaluates their implemented BMPs and additional BMPs identified in the Level 1 ERA Report to determine whether the BMPs will achieve compliance with the effluent limitations of the General Permit and are expected to eliminate future NAL exceedances);

(b) *Non-Industrial Pollutant Source Demonstration* (the Facility determines that its NAL exceedances are attributable solely to the presence of non-industrial pollutant sources); or

(c) *Natural Background Pollutant Source Demonstration* (the Facility determines that its NAL exceedances are attributable solely to the presence of pollutants in the natural background that has not been disturbed by industrial activities).

The Level 2 ERA Action Plan must address all drainage areas with corresponding Level 2 exceedances and must include a time schedule and detailed description of the specific tasks required to complete the selected demonstration(s). **Further, all elements of the Action Plan must be implemented as soon as possible and completed no later than one year following the submission of the Action Plan.**

Level 2 ERA Technical Report

On January 1 of the reporting year following submittal of a Level 2 ERA Action Plan, Dischargers in Level 2 must certify and submit a Level 2 ERA Technical Report prepared by a QISP that describes the Facility's progress with its selection of either the (a) Industrial Activity BMPs; (b) Non-Industrial Pollutant Source Demonstration; or (c) Natural Background Pollutant Source Demonstration.

Furthermore, if additional NAL exceedances occur the following reporting year for the same parameter and the same drainage area, Dischargers must annually update the Level 2 ERA Technical Report by January 1 of each subsequent year during which exceedances continue to occur.

**Failure to Submit Level 1 ERA Report**

Based on the sample data summarized above, the Facility exceeded the EPA Benchmark NAL for Aluminum, Magnesium, and Total Suspended Solids (TSS) and was elevated to Level 1 Status on July 1, 2023, pursuant to Section XII.C – Exceedance Response Actions -- of the General Permit.

Pursuant to Section XII.C.2 of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2023, and to certify and submit to SMARTS an adequate Level 1 ERA Report prepared by the QISP on or before January 1, 2024.

As of the date of this Notice, EDEN alleges that AES Sunoptics has failed to conduct an adequate Level 1 status evaluation and has also failed to certify and submit to SMARTS a Level 1 ERA report.

Every day that AES Sunoptics operates at the Facility without complying with the required Exceedance Response Actions pursuant to the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

AES Sunoptics has been in daily and continuous violation of the General Permit's ERA requirements every day since January 1, 2024. These violations are ongoing, and EDEN will include additional violations when information becomes available.

### I. _Failure to Properly Train Employees/Facility Pollution Prevention Team_

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

AES Sunoptics has failed to comply with numerous standard conditions of the General Permit as outlined above and has failed to retain a QISP to trains its Pollution Prevention Team after entering Level 1 status, in violation of General Permit Section XII.

Based on the foregoing violations, it is clear that AES Sunoptics has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

AES Sunoptics may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are AES Sunoptics, Inc. and A-1 Distributing Incorporated, as well as the respective corporate officers and employees of the Facility responsible for compliance with the CWA.

### V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is January 1, 2023, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

The attorney assigned to this matter is:

Adam D. Brumm, Esq.
Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215, extension 906
Email:  adam@edendefenders.org


**To ensure an expedited response to this Notice, please send all initial communications to the following email address:  responses@edendefenders.org.**


## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law**

**currently authorize civil penalties of $57,617.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to 33 U.S.C. § 1365(d), EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred in this matter.

### VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages AES Sunoptics' counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how AES Sunoptics may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if AES Sunoptics wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from AES Sunoptics' counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel.  Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eric Oppenheimer, State Water Resources Control Board, eric.oppenheimer@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov

# EXHIBIT B



State Water Resources Control Board

# NOTICE OF INTENT
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH INDUSTRIAL ACTIVITY (WQ ORDER No. 2014-0057-DWQ)
(Excluding Construction Activities)



GAVIN NEWSOM
GOVERNOR

YANA GARCIA
SECRETARY FOR
ENVIRONMENTAL PROTECTION

| | |
|---|---|
| WDID: 5S34I030077 | Status: Active |

## Operator Information
Type: Private Business

| | |
|---|---|
| Name: AES Sunoptics Inc | Contact Name: Grant Grable |
| Address: 6250 27th Street | Title: VP Operations and Business Development |
| Address 2: | Phone Number: 916-395-4700 |
| City/State/Zip: Sacramento CA 95822 | Email Address: grant.grable@aessunoptics.com |
| Federal Tax ID: | |

## Facility Information
Level:

| | |
|---|---|
| Contact Name: Grant Grable | Title: VP Operations and Business Development |
| Site Name: AES Sunoptics Inc | |
| Address: 6250 27th Street | |
| City/State/Zip: Sacramento CA 95822 | Site Phone #: 916-395-4700 |
| County: Sacramento | Email Address: grant.grable@aessunoptics.com |
| Latitude: 38.512251   Longitude: -121.477756 | Site Size: 4.6 Acres |
| Industrial Area Exposed to Storm Water: | 4.1 Acres |
| Percent of Site Impervious (Including Rooftops): | 89 % |

## SIC Code Information

1. 2821    Plastics Material and Synthetic Resins, and Nonvulcanizable Elastomers
2. _____    _____
3. _____    _____

## Additional Information

| | |
|---|---|
| Receiving Water: Morrison Creek | Flow: Indirectly |
| Storm Drain System: | |
| Compliance Group: | |

| | |
|---|---|
| RWQCB Jurisdiction: Region 5S - Sacramento | |
| Phone: 916-464-3291 | Email: r5s_stormwater@waterboards.ca.gov |

## Certification

| | |
|---|---|
| Name: Grant Grable | Date: January 13, 2023 |
| Title: VP Operations and Business Development | |



State Water Resources Control Board




GAVIN NEWSOM
GOVERNOR

YANA GARCIA
SECRETARY FOR
ENVIRONMENTAL PROTECTION

## NOTICE OF INTENT
GENERAL PERMIT TO DISCHARGE STORM WATER
ASSOCIATED WITH INDUSTRIAL ACTIVITY (WQ ORDER No. 2014-0057-DWQ)
(Excluding Construction Activities)

| WDID: 5S34I030077 | Status: Active |

## Operator Information

Type: Private Business

| Name: AES Sunoptics Inc | Contact Name: Grant Grable |
| Address: 6250 27th Street | Title: VP Operations and Business Development |
| Address 2: | Phone Number: 916-395-4700 |
| City/State/Zip: Sacramento CA 95822 | Email Address: grant.grable@aessunoptics.com |
| Federal Tax ID: | |

## Facility Information

Level:

| Contact Name: Grant Grable | Title: VP Operations and Business Development |

Site Name: AES Sunoptics Inc

Address: 6250 27th Street

| City/State/Zip: Sacramento CA 95822 | Site Phone #: 916-395-4700 |
| County: Sacramento | Email Address: grant.grable@aessunoptics.com |
| Latitude: 38.512251   Longitude: -121.477756 | Site Size: 4.6 Acres |

Industrial Area Exposed to Storm Water: 4.1 Acres

Percent of Site Impervious (Including Rooftops): 89 %

## SIC Code Information

1. 3999    Manufacturing Industries, NEC
2. _____
3. _____

## Additional Information

| Receiving Water: Morrison Creek | Flow: Indirectly |

Storm Drain System:

Compliance Group:

RWQCB Jurisdiction: Region 5S - Sacramento

| Phone: 916-464-3291 | Email: r5s_stormwater@waterboards.ca.gov |

## Certification

Name: Grant Grable          Date: January 13, 2023

Title: VP Operations and Business Development